THE STATE *ex rel.* WOODSON, *Appellant* v. BRASSFIELD *et al.*

PER HENRY, J., AND SHERWO D, C. J.

67   331
96   38
67   331
116   602
67   331
123   89
67   331
128   111
67   331
162   539
162   540
162   542

1. **Township Railroad Bonds**; TOWNSHIP A⸱D ACT OF 1868 UNCONSTITUTIONAL. The act to facilitate the construction of railroads (Acts 1868, p. 92; Wag. Stat., p. 313, §§ 51, 55), and for that purpose authorizing any municipal township "to subscribe to the capital stock of any railroad company ☸ ☸ ☸ whenever two-thirds of the qualified voters of such township, voting at an election held for that purpose, are in favor of such subscription," is in conflict with section 14, article 11 of the constitution of 1865, which declares that "the General Assembly shall not authorize any county, city or town to become a stockholder in ☸ ☸ any ☸ ☸ corporatio., unless two-thirds of the qualified voters of such county, city or town, at a regular or special election, to be held therein shall assent thereto," and the act is void.

2. **Registration and Qualification of Voters** under the Constitution of 1865: EVIDENCE. While the provisions of the constitution of 1865 in reference to the registration of voters, and the statutes enacted in pursuance thereof, were in force, those persons only were qualified voters, whose names were placed on the registration books. This was the final, qualifying act, and no matter if a citizen possessed every other qualification, if not registered, he was not a qualified voter. The registration books furnished the test of the number of qualified voters in a township.

3. **The "Assent" of the Qualified Voters** required by Sec. 14,. Art. 11 of the constitution of 1865, before a municipal subscription

could be made to the stock of a corporation, was an affirmative, positive act. Mere inaction of the voters, by failing to vote, did not express assent within the meaning of that section.

4.   **Municipal Subscriptions to Railroads:** SURRENDER OF STOCK TO THE COMPANY. Under an act which authorizes a municipal township to subscribe stock in a railroad company, it is not competent for the township to agree to surrender to the company stock of the company for which it subscribes and issues its bonds; and a contract of subscription which contains such an agreement, is void.

PER HOUGH. J.

5.   **The Legislature had Power** under the constitution of 1865 to authorize municipal townships to subscribe to the stock of railroad companies, but subject to the restrictions contained in § 14, Art. 11, which prohibited the making of such subscriptions without the assent of two-thirds of the qualified voters.

6.   **Township Aid Act of 1868 Constitutional:** ELIMINATION OF UNCONSTITUTIONAL WORDS. The act of 1868, to facilitate the construction of railroads, is not unconstitutional. The clause which permits a subscription to be made by a township when the question of subscribing has been submitted to the qualified voters of the township at an election duly ordered, and two-thirds of the qualified voters voting at such election are in favor of the subscription, is in contravention of § 14, Art. 11 of the constitution of 1865, but the words "voting at such election" may be eliminated, and the act will then remain complete and perfect, in harmony with the constitution, and capable of being fully executed.

7.   **Registration Books:** ELECTION RETURNS: EVIDENCE. Neither the registration books nor the votes actually cast at an election, were conclusive evidence of the number of votes in a township. It was competent to show by testimony *aliunde* that the actual number of voters was greater than the vote cast and less than that registered.

*Appeal from Platte Circuit Court.*—HON. PHILANDER LUCAS, Judge.

*S. C. Woodson* for appellant.

1.   The law provides for the payment of interest not exceeding ten per cent. per annum. The proposition submitted to the voters of the township was for the payment of semi-annual interest at ten per cent., which is a plain violation of the law, and a fatal objection to the subscrip-

tion. 2. The stipulation for surrender of the stock to the company is in contravention of § 54, p. 314, Wag. Stat., and being an essential condition of the subscription makes it void. 3. Appellant should have been permitted to show the bonded indebtedness of the city of Weston. Added to this township subscription it exceeded the ten per cent. limit fixed by law upon municipal subscriptions. Acts 1871, p. 55. 4. It is a felony for any county court to subscribe stock or issue bonds unless authorized to do so by a vote of two-thirds of the qualified voters of the county or township. Acts 1872, p. 19. This act requires the affirmative action of two-thirds of the voters evidenced by actual vote, and the court erred in refusing to allow respondents to show that on the day of the election there were 600 qualified voters in said township, and that 385 votes did not constitute two-thirds of the qualified voters.

*J. E. Merryman* and *John Doniphan* for respondents, insisted that the act of 1868 had been complied with.

HENRY, J.—The requisite number of the qualified voters and taxable inhabitants of Weston township, Platte county, on the 20th day of May, 1872, petitioned the county court of said county to submit to the qualified voters of said township a proposition to subscribe for $60,000 of the capital stock of the Missouri & Iowa Railroad Company by said county, for the use and benefit of said township. A special election was ordered by the county court, and in pursuance of the order, held on the 2nd day of July, 1872, at which 487 votes were cast, 385 for, and 102 against the the proposition. The following are the details of the proposition: A subscription for $60,000 of the capital stock of said company, to be paid for in the bonds of said township, at par, of the denomination of $1,000, payable 20 years after their date, with interest coupons attached, payable semi-annually, in the City of New York, at some suitable bank or banking house; the railroad company to

issue its certificate of stock for the said sum to said county, for the use and benefit of the tax-payers of Weston township, and thereupon the bonds and certificate of stock to be deposited in some bank or banking house in Platte county, which should be required under an appproved bond to deliver the same to the railroad company as follows: Whenever one mile of the said road should be actually completed, &c., $7,500 of the bonds, and a like amount of the stock subscribed for, to be delivered to the company, and for every additional mile so completed, the same amount of bonds and stock, to be delivered to the company; provided that if said company should execute and deliver a bond with approved security, to Platte county, in the penal sum of $120,000, conditioned to return the bonds and stock, if the company failed to complete the road within a reasonable time, then the whole amount of said stock and bonds should be delivered to the company.

This was a proceeding instituted by the prosecuting attorney of Platte county, in the name of the State, to enjoin the judges of the county court from issuing said bonds. A temporary injunction was granted by the judge of the probate court of Platte county, which, on answer and motion, was dissolved by the circuit court of said county, and from that judgment the plaintiff has appealed to this court. In 1870 there was a registration of the voters of Platte county, showing 726 registered voters in Weston township, and a registration of the voters of said county taken in November, 1872, showed that there were in said township 578 qualified voters.

The following question arises for determination on this state of facts: Did the requisite number of qualified voters of Weston township assent to the proposition submitted? This is a question of the gravest importance, in consequence of the vast amount of bonds issued by the municipalities of this State to aid in the construction of railroads, and of recent decisions of the Supreme Court of the United States and

1. TOWNSHIP RAIL-ROAD BONDS: township aid act of 1868 unconstitutional.

of this State on the validity of the act of the General Assembly of this State approved March 23rd, 1868, authorizing any municipal township " to subscribe to the capital stock of any railroad company in this State proposing to build a railroad into, through or near such township, whenever two-thirds of the qualified voters of such township, voting at an election held for that purpose, are in favor of such subscription." The constitution of 1865, in force when that act was passed, and when the election under consideration was held, provided that " the General Assembly shall not authorize any county, city or town to become a stockholder in, or to loan its credit to, any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town at a regular or special election, to be held therein, shall assent thereto." Sec. 14, Art. 11. It will be perceived that the act of the General Assembly does not authorize the subscription in the words of the constitution, but qualifies them by the addition of the words "voting at such election." The constitution requires the assent of two-thirds of the voters of the township, while the law requires the vote of two-thirds of the voters voting at such election.

If the language of the constitution and that of the statute mean the same thing, that is an end of the controversy. If all the voters who vote at an election are, in law, all the qualified voters of the election district, then there is no conflict between the constitution and the law. Does the phraseology of the constitution and that of the law mean the same thing? If it were a question of the first impression—if the fact, that innocent purchasers of bonds issued under the law, will be affected by the determination of this question, were kept entirely out of view —if we could close our eyes to the railroad history of the State, we doubt if any one would seriously contend that the constitution and the act of the General Assembly are in entire harmony with each other.

The case of *Bassett v. The Mayor of St. Joseph*, 37 Mo.

272, and the *State v. Binder*, 38 Mo. 456, are not in point
here. In the first of those cases the court
said: " We think it was sufficient that two-
thirds of the qualified voters, who voted at
the special election, authorized for the express purpose of
determining that question, on public notice, duly given,
voted in favor of the proposition. This was the mode
provided by law for ascertaining the sense of the qualified
voters of the city upon that question. There would ap-
pear to be no other practicable way in which the matter
could be determined." The authority in that case was
given by an act of the Legislature, and no constitutional
question was involved. While there may have been " no
other practicable way in which the matter could be deter-
mined," in that, no such difficulty existed in this case. The
same constitution which required the assent of two-thirds
of the qualified voters, to authorize a subscription for the
capital stock of a railroad company by a town, city or
county, provided for " a complete and uniform registra-
tion, by election districts, of the names of the qualified
voters in this State, which registration shall be evidence
of the qualification of all registered voters to vote at any
election thereafter held." It further provided that a new
registration should be made within 60 days, next preced-
ing the tenth day prior to every biennial general election,
and after it should have been made, no person should es-
tablish his right to vote by the fact of his name appearing
on any previous register. The Legislature passed an act
to enforce these requirements of the constitution, and from
the date of its approval to that of its repeal, there was " a
practicable way" of ascertaining the number of qualified
voters in every township in the State.

While the registration law was in force, they only were
qualified voters whose names were placed on the registra-
tion books. This was the final, qualifying act, and no
matter if a citizen possessed every other qualification, if
not registered, he was not a qualified voter. It was not

2. REGISTRATION
AND QUALIFICA-
TION OF VOTERS
UNDER THE CON-
STITUTION OF 1865:
evidence.

the right to register which constituted one a qualified voter, but the fact of being registered as such, was also essential. A qualified voter is one who by law, at an election, is entitled to vote. If, by the law, a person was not entitled to vote, whether in consequence of a disability which deprived him of the right to register, or of his neglect to register with a perfect right to do so, he was equally disqualified. So that the constitution and the act of the General Assembly when this election was held, afforded complete and perfect means of ascertaining exactly how many, and who were, qualified voters in Weston township —a circumstance so widely distinguishing this from the case of *Bassett v. The Mayor, &c.*, and the *State v. Binder*, that they have no application whatever to the question involved here. Both of those cases, however, are in direct conflict with the *State v. Winkelmeier*, 35 Mo. 103, in which this court held where 13,000 votes were polled at an election, of which only 5,000 were in favor of the proposition submitted to permit the sale of liquors on Sunday, and only 2,000 were against it, that the vote of 5,000 was not the vote of the majority. The act of the Legislature in question there, authorized certain municipalities to permit the sale of liquors on Sunday, whenever authorized by a majority of the legal voters of the municipality. If those who stay away from the polls are to be taken as assenting to a proposition submitted to the voters, those who vote at that election in other matters, but decline to vote on the proposition submitted, are also to be held as assenting, because equally with those who stayed away, they failed to express their disapproval. If "silence gives consent," in the one case, it will in the other, and hence we say that the cases above cited are in direct conflict with the Winkelmeier case.

In the *State ex rel. v. Sutterfield*, 54 Mo. 392, this court expressly approved the doctrine of that case and gave a clear and strong intimation against the soundness of that announced in other cases. Said Judge Napton, who

delivered the opinion of the court, all concurring : "We are referred, however, to two decisions of this court, (*Bassett v. the Mayor* and the *State v. Binder*,) which are supposed to maintain views conflicting with this opinion. We should hesitate to interfere with previous adjudications of this court, if, upon the faith of such decisions, property had been acquired or money invested." He then states the facts and conclusion of the court in the Winklemeier case and remarks " so that we have two decisions one way and one the other, and the last is exactly in conformity with the facts on the record in this case. The return of the county justices shows that not even a majority of the votes cast were for the removal. In none of these cases, however, was there any examination of, or construction given to, the precise language of the constitutional provision now under consideration." The constitutional provision under consideration in that case was Sec. 30, Art. 4, which is as follows : " The General Assembly shall have no power to remove the county seat of any county, unless two-thirds of the qualified voters of the county, at a general election shall vote in favor of such removal." At the November election, 1872, a proposition to remove the county seat of Reynolds county, then submitted, did not receive two-thirds of the legally registered votes of Reynolds county, nor were two-thirds of the legal votes of said county polled at said election, as appeared by the returns of said registration and election. At a registration held for said county, within sixty days preceding the tenth day prior to said November 5th, 1872, 694 voters were legally registered in said county and the proposition to remove the county seat received only 244 votes out of the 694 legally registered voters, and out of 547 votes actually polled at said election. Only 47 votes however were cast against the removal. Citing the case of *Rex v. Foxcroft*, 2 Bur. 1017, and observing that " it is rightfully followed in many cases in this country where it might be properly applied," Judge Napton said: " But the deci-

sions in England, or in the other States, are very unsafe
guides, when we are called upon to construe a constitu-
tional or statutory provision of our own State. If the
language is plain and unambiguous, its requirements can
not be set at naught upon the strength of decisions else-
where on statutes, or constitutions essentially variant or
couched in very different terms. Our constitution, in
regard to the proposed removal of county seats, it seems
to me, hardly admits of two constructions." The court
held that the section of the constitution then under con-
sideration required two-thirds of the qualified voters of
the county to vote in favor of the proposition, to author-
ize the removal of a county seat, and that two-thirds of
all the votes polled at such election in favor of removal,
if not also two-thirds of all the votes shown by the regis-
tration, would not authorize the removal.

The only difference between that section of the con-
stitution and the one now under consideration is found in
3. THE "ASSENT" the words "shall vote in favor of such re-
OF THE QUALIFIED
VOTERS.        moval," used in that section, and "shall
assent thereto," used in this. To assent is "to admit,
yield or concede, or rather to express an agreement of the
mind to what is alleged or proposed." This is Webster's
definition of the word. Does one, by staying from the
polls, "express an agreement of his mind" to a proposi-
tion voted upon, or simply manifest thereby an indiffer-
ence on the subject? Or is it a fair inference that every
voter who fails to vote, assents to the proposition submit-
ted, when, as is well known, at every election, sickness,
temporary absence from the election district and pressing
private business, which will not admit of postponement,
prevent many from voting, who would otherwise gladly
cast their votes? But upon what principle is it assumed
that the absent voters assent? Suppose that not a vote
were polled on the proposition submitted, would it be as-
sumed that it had the assent of all the qualified voters?
This is an extreme case, which we have supposed, but it

aptly shows the absurdity of the assumption. The assent required is an affirmative, positive act. The constitution does not mean that if no one says nay, all shall be taken as saying yea.

Mr. Justice Bradley, in his dissenting opinion in *Cass County v. Johnson,* 95 U. S. 360, said: "If the Missouri convention which framed the constitution of 1865, desired to prevent municipal subscriptions to railroad and other enterprises, except by the consent of a majority of the people qualified to vote in the district to be affected, I do not see what language could have been adopted more apt for the purpose than that which is actually used in the 14th section of article 11. The literal meaning of this clause seems to me unmistakably to require two-thirds of the qualified voters, whether they vote or not. The language is just as strong as that of the 24th section of article 4, which declares that 'no bill shall be passed unless by the assent of a majority of all the members elected to each branch of the General Assembly.' This clause has always been construed to mean that no law can be passed unless a majority of the members vote for it, whether all are present or not." Does the word "assent" bear a different meaning here from its import in section 14, article 11? The means provided by the constitution and the law for ascertaining the exact number of qualified voters were as perfect and complete as those for ascertaining the exact number of representatives and senators composing the General Assembly, and there is nothing in section 14, article 11, to indicate that the word "assent" is there used in any different sense from that in which it is employed in section 24, article 4; and yet it will not be contended by anyone that less than a majority of all the members of each house, actually voting for a bill, would answer to the requirement of the constitution. There is no substantial difference in that respect betwixt the two sections, and we hold that the opinion of Judge Napton, in the Sutterfield case, the only case in which this court had been called

upon to construe either of these constitutional provisions, announced the proper construction, and the cavalier manner in which it was noticed by the Supreme Court of the United States, in *Cass County v. Johnson*, overruling *Harshman v. Bates County*, 92 U. S. 569, *then, but recently decided by that court*, has not abated our confidence in the soundness of the doctrine announced by Judge Napton in his opinion, the opinion of the court in the Sutterfield case.

The Supreme Court of the United States, in *County of Cass v. Johnson*, said: "In *State v. Sutterfield*, the question was as to the construction of another clause in the constitution, and the decision was placed expressly on the ground of a difference between the two provisions." This is an entire mistake. Judge Napton did not, in that opinion, allude, even in the remotest terms, to the 14th section of article 11. In *Cass County v. Johnson*, there was a singular confounding of constitutional provisions with legislative enactments. We have a proper respect for the opinion of that court, and are bound to obey its mandates in causes taken there from this court, on writs of error or appeal, but in other cases, are no more bound by its decisions than by those of any other respectable court; and on questions arising under our own constitution, we are not inclined to disregard the adjudications of this, to follow those of that, or any other court, except when under constitutional obligations to do so. And, while disposed to receive light from every source, and to determine disputed questions on the weight of authority, yet, when this court has satisfactorily interpreted our State constitution, we feel no inclination to depart from that interpretation because other courts have placed upon it a different construction. We have failed to perceive that the opinion in *Cass County v. Johnson* is any more able or conclusive, than that of the same court in *Harshman v. Bates County*, then recently delivered, which it expressly overruled.

In not one of the cases cited in that opinion from the

The State ex rel. Woodson v. Brassfield.

Missouri Reports was the constitutionality of the act of 1868 directly passed upon. In not one of them did this court place a construction upon the constitutional provision involved in the case of *Cass County v. Johnson.* In the Linn county case, 44 Mo. 504, principally relied upon, this court did not consider the constitutionality of the act with respect to the number of votes it required to authorize a subscription, and said nothing as to the proper construction of the constitutional provision in that regard. Mr. George W. Easley, counsel for respondent in that case, whose brief is before me, contended that the act of 1868 was unconstitutional, because the bonds, if issued, would be an indebtedness of the county, and not of the township; because, 1st, the township had no authority to make the bonds; 2nd, the township was not a corporation. He did not, in his brief, nor did this court, in its opinion, consider the question now under discussion, and the only case in which the construction of a similar provision of the constitution was directly considered by this court, the Supreme Court of the United States in *Cass County v. Johnson,* brushes away, as if of no consequence in comparison of the other Missouri cases cited and relied upon. That court entirely overlooked the palpable distinction between the two cases of *Bassett v. The Mayor, &c.,* and the *State v. Binder,* and the Sutterfield case, that the former involved the construction of statutes, and there was no question as to their conflict with the constitution, while the latter case was determined by a construction of a constitutional provision. Those cases might be upheld on the grounds assigned by the court, and the Sutterfield case stand as an interpretation of the constitutional provisions, without overruling those cases in any respect. If the Linn county case and the Sutterfield case are in conflict, it is singular that not one of the judges, all of whom concurred in both opinions, called the attention of his associates to the conflict.

We shall not review the numerous cases from other

States relied upon by those who maintain contrary views to those here expressed. Some of them are in opposition to this opinion, but we prefer to follow the direct decision of this court on the question, because we are satisfied that it was rightly decided, and if the Sutterfield case was rightly decided the difference in the phraseology of the two sections of the constitution is too slight to justify a different construction of the one from that properly placed on the other. By the act of the General Assembly, providing for an election for the removal of county seats, it was enacted as follows: " If it shall appear by such election that two-thirds of the legally registered voters of said county are in favor of the removal of the county seat of such county, then the county court shall appoint five commissioners," &c. Under the decisions in *Bassett v. The Mayor*, and the *State v. Binder*, if two-thirds voting at an election held under that law, voted for the proposition, that would have been sufficient to effect the removal, although less than two-thirds of the registered voters—nay, if two-thirds or all of those who voted at the election voted against removal, yet if two-thirds of the legally registered voters failed to attend and vote at the election, they would have been taken to favor the proposition and on that vote the county seat could have been legally removed. The Supreme Court was therefore compelled in the Sutterfield case to construe the constitution, which it did, and held that notwithstanding the act of the General Assembly if two thirds of the registered voters did not vote for the removal, the county seat could not be changed. In this case, the proposition submitted to the voters did not receive two-thirds of the votes registered in 1870. It lacked one vote of receiving two-thirds of the votes registered in 1872, just after the vote was taken; and to say under these circumstances that it received the assent of two-thirds of the qualified voters of Weston township, would be to shut our eyes to a patent truth, and blindly permit a palpable false-

hood to fasten upon the tax-payers of the township an enormous debt.

Another fatal objection to the whole proceeding is to be found in the stipulation that the certificates of stock issued to the county for the benefit of the taxpayers of Weston township should be given back to the company, together with the bonds for the stock, $7,500 of each on the completion of each mile of road, and the whole amount whenever the company should give bond and security for the completion of the road within a reasonable time. If those who voted for the proposition were willing and could by vote, surrender their interest in the stock could they also vote away the rights of the minority in that stock? Can the majority fasten a debt on the minority, and, by the same vote, deprive them of the consideration they were to receive for the debt incurred? Have minorities in this country no rights which majorities are bound to respect? If this proceeding is to be upheld, they have not in their property, but hold it at the will and caprice of the majority. Constitutional provisions and legislative enactments which authorize a majority, or any other number of voters to impose a debt upon, or take their property from, a minority, if held valid at all, should be strictly construed; especially when they authorize, as in this case, the debt to be imposed or the property taken in favor of a private corporation; and, as an original proposition, we would hold that a railroad corporation whose stockholders are individuals who are to operate the road for their individual gain, are not public corporations in the sense that private property may be taken for their benefit under the constitutional provision allowing the condemnation of private property for public use, or under the power to impose taxes or burdens for governmental purposes. And the rule requiring a strict construction of such laws, applies with full force to that clause in our constitution, requiring a vote of two-thirds of the qualified voters to

*Margin note: 4. MUNICIPAL SUBSCRIPTIONS TO RAILROADS: surrender of stock to company.*

authorize a subscription by a municipality for the capital stock of a railroad company.

The judgment of the circuit court is reversed and the cause remanded, with directions to enter a decree perpetually enjoining the county court of Platte county from issuing the bonds in question, or any other bonds in payment for any subscription which has been or may be made on the vote at the said special election held July 2nd, 1872. SHERWOOD, C. J. concurs; HOUGH, J. files a separate opinion; NAPTON and NORTON, JJ. not sitting; the latter having been of counsel in the cause.

REVERSED.

HOUGH, J.—On the 12th day of August, 1872, after an election, duly held, on the 2nd day of July, 1872, in the township of Weston, in pursuance of the first section of "an act to facilitate the construction of railroads in the State of Missouri," approved March 23rd, 1868, the following order was made by the county court of Platte county: "It is ordered by the court, that the voters of Weston township by a vote of over two-thirds of the qualified voters of said township, having on the 2nd day of July, 1872, voted a subscription of $60,000 to the Missouri & Iowa Railroad Company, therefore the presiding justice of this court, Thomas H. Talbott, is ordered to sign said bonds and coupons in the name of Platte county, for and on the part of Weston township, and the clerk of this court is ordered to attest the same and attach the seal of the court. The bonds to be of the denomination of $1,000 each, due 20 years after date, with interest coupons attached, payable semi-annually at the rate of ten per cent. per annum, at the American Exchange National Bank in the city of New York, in the State of New York, on the 1st day of February and August of each year, which bonds are to be delivered on the terms and conditions set forth in the order of this court made on the 20th of May, 1872, and that the Missouri & Iowa Railroad Company pay all

The State ex rel. Woodson v. Brassfield.

costs of the issuance of said bonds." On the following day an appeal to the circuit court, from the foregoing order of the county court, was prayed and granted and an appeal bond was given and approved. On the 14th day of March, 1873, the present proceeding was instituted to enjoin the county court from issuing the bonds referred to in its order of the 12th of August, 1872. A preliminary injunction was granted by the judge of the probate court, which was on motion, filed in the circuit court, dissolved, and the petition dismissed, and the plaintiff has appealed to this court.

At the hearing, it was agreed between the parties that at the election held on the 2nd of July, 1872, three hundred and eighty-five votes were cast in favor of the subscription, and one hundred and two against it. It was further agreed that there were seven hundred and twenty-six voters registered in Weston township in November, 1870, and in November, 1872, five hundred and seventy-eight voters were registered in said township. The plaintiff thereupon offered to prove that on the 2nd day of July, 1872, the day on which the election was held, in pursuance of which the bonds in question had been ordered to be issued, there were six hundred of the voters on the registration list of 1870, then residing in Weston township, who were qualified to vote; which testimony was rejected by the court and the plaintiff excepted. We are now to determine whether this testimony should have been received.

Before entering upon this inquiry it may be proper to remark that no question arises here as to the propriety of making the railroad company a party defendant, as there is no evidence in the record that any subscription was ever made; and the remarks of Judge Bradley in the case of *Harshman v. Bates Co.*, 92 U. S. 569, as to the vested rights of the railroad company, after a subscription has been made, have, therefore, no application here. The judges of the county court are the only parties defendant,

and no point is made by them that they had passed upon the returns, and decided that two-thirds of the qualified voters had voted for the subscription, or that no appeal had been taken from the order of the court reciting that fact. The effect of such a decision therefore, need not now be considered. I am thus particular in mentioning these matters, in order that none of them, so far as my opinion is concerned, may be deemed to have been passed upon by implication.

The only question now before this court is as to the admissibility of the evidence offered by the plaintiff and 5. LEGISLATURE COULD AUTHORIZE rejected by the court. I have no doubt whatTOWNSHIPS TO SUBSCRIBE. ever of the power of the Legislature under the constitution of 1865 to authorize municipal townships to subscribe to the stock of railroad companies, nor have I any doubt, but that the 14th section of article 11, of the constitution of 1865, prohibiting counties, cities and towns from making such subscriptions unless two-thirds of the qualified voters therein assent thereto, is applicable also to municipal townships. And it is equally clear to my mind that the provision in the first section of the act of 1868, authorizing such subscriptions whenever two-thirds of the qualified voters of the township voting at an election held in pursuance of said section, shall direct the same to be made, does not meet the requirements of the constitution, for the simple reason that "two-thirds of the qualified voters of such township voting at such election" may not be " two-thirds of the qualified voters" of the township. Cases might arise in which two-thirds of the voters voting would constitute two-thirds of the qualified voters, but it is the duty of the Legislature, in prescribing a rule of action to provide one which will in no case countenance a violation of the constitution. I am not aware of any case in this State which places a construction upon this provision of the constitution, different from that here given it. Neither in the case of the *State v. Linn County*, 44 Mo. 504, nor in any of the numerous cases which have subse-

quently been before this court, involving the validity of railroad subscriptions by municipal townships, under the act of 1868, was the constitutionality of the clause of that act, now under consideration discussed or decided.

In some of the cases, two-thirds of the voters voting may have been two-thirds of the qualified voters, and, for that reason, the question may not have been raised, and in all of them it was competent for the litigants to waive the right to object to the validity of the bonds on the ground that two-thirds of the qualified voters had not voted to issue them; and the reported cases simply show that the right so to object was waived; that is to say, those assailing the validity of the bonds failed, or declined, to make the constitutional objection now made. The unauthorized act of an agent may be ratified by the constituent, and I see no difference in this regard between an agent created by an act of the Legislature and one appointed by the constituent. The most that can be said, therefore, of the various decisions in this State, in relation to township bonds, is that they necessarily decide, only, that municipal townships may lawfully subscribe for stock in a railroad.

The want of conformity to the constitution, in the act of 1868, as to the number of votes necessary to author-
6. TOWNSHIP AID ACT OF 1868 CONSTITUTIONAL: elimination of unconstitutional words. ize a subscription does not, in my opinion, invalidate the whole act. The authorities are numerous and convincing, that one section of an act, or a part of a section, may be unconstitutional, and the remainder of the act be unaffected thereby, *vide* Cooley's Con. Lim, 177 and 178, and authorities there cited. *Commonwealth v. Hitchings*, 5 Gray 482; *Robinson v. Bidwell*, 22 Cal. 379; *County Court of St. Louis County v. Griswold*, 58 Mo. 199, 200. In the case last cited, this court said: " Where a clause in an act is rendered invalid on account of some constitutional prohibition, that will be stricken out or disregarded, but the other parts that are not liable to any such objection will remain good, and the act will be enforced, provided enough is left to put it in

operation and carry out the object had in view in its enactment." In the *Commonwealth v. Hitchings, supra,* the court said : " It is also well settled that when part of a statute is unconstitutional, that will not authorize the court to declare the remainder of the statute void, unless all the provisions are connected in subject matter, depending on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed that the Legislature would have passed one withoutt he other, *Wellington, petitioner,* 16 Pick. 87; *Fisher v. McGirr,* 1 Gray 21 ; *Warren v. Mayor and Aldermen of Charlestown,* 2 Gray 84 ; *Commonwealth v. Clapp,* 5 Gray 100. The constitutional and the unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand, though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. It is quite clear that Judge Bradley, in his opinion in *Harshman v. Bates county, supra,* did not regard the whole act as unconstitutional, else he could not have approved the decision of this court in the Linn county case, which he evidently does in the following language : " The case of the *State v. Linn County Court, supra,* only decides that if the county court refuses to issue bonds after making a subscription a mandamus will lie to compel it to issue them. There the authority had been executed and the right had become vested." " If," says Judge Cooley, "when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed wholly independent of that which was rejected, it must be sustained," Con. Lim. 178. Now, after eliminating the objectionable words, " voting at such elections," in the first section of the act of 1868, a complete and perfect act remains, one in harmony with the constitution in all its parts, and capable of being fully executed without

the aid of the rejected words. The act will then read: "and if it shall appear from the returns of such election, that not less than two-thirds of the qualified voters of such township are in favor of such subscription, it shall be the duty of the county court to make such subscription in behalf of such township, according to the terms and conditions thereof," &c.

How then is it to be determined whether two-thirds of the qualified voters of the township have voted in favor

7. REGISTRATION BOOKS: election returns: evidence. of the subscription? It appears in the present case that there were 726 registered voters in Weston township in November, 1870. Surely this list is not conclusive evidence of the number of qualified voters residing in Weston township on the 2nd of July, 1872, nearly two years thereafter. It is conclusive indeed that there was not more than that number of qualified voters, for no one was qualified to vote who was not registered. But it is not conclusive that there was not a less number. One-fourth or one-half of the number registered in November, 1870, might have died, or removed from the township, in the period of time intervening between that date and the 2d of July, 1872; and it would be clearly competent, I think, to show that fact if such were the fact. On the other hand, the registration made in November, 1872, is not conclusive evidence of the number of qualified voters residing in Weston township on the 2d day of July, 1872. It might be that one hundred of the number became entitled to register by attaining their majority, or completing the necessary residence in the interval between the last two mentioned dates. Surely it would be competent to show this fact, if such were the fact. Neither of these lists were, in my opinion, conclusive evidence of the number of qualified voters in Weston township at the date of the election in question. In regard to the votes cast at the election, I think they were *prima facie* evidence of the number of legal voters in the township at that time, but it was competent for the plaintiff to show

that the real number was greater; and the mode proposed by the plaintiff's counsel was the best conceivable method for that purpose; that was, to show that of the 726 voters registered in 1870, there still resided in the township as many as 600, none of whom had in the meantime become disqualified. When a fact in issue is susceptible of proof, testimony conducing to show its existence is not to be excluded merely because it may be difficult, or inconvenient, to prove such fact.

It has been said in explanation of the fact that there has been no direct adjudication upon the clause in the act of 1868, now under consideration, that prior to the passage of that act, in the cases of the *State v. Winkelmeier*, 35 Mo. 103; *State v. The Mayor of St. Joseph*, 37 Mo. 270, and the *State v. Binder*, 38 Mo. 450, construction had been given to statutes, the language of which was similar to that employed in the constitution of 1865, and that the interpretation there given was simply embodied in the act of 1868. *Cass County v. Johnson*, 95 U. S. 360. I do not concur in this view. The act of 1868 makes that conclusive, which was, in my opinion, only *prima facie* evidence before. I do not agree with those who think that the case of the *State v. Winkelmeier* is in conflict with the other two cases cited. There is a difference between the cases, but no conflict. In the *State v. Winkelmeier* it appears that an election for city officers was held on the same day on which a proposition authorizing the city to grant permission to sell refreshments on Sunday, was submitted—a majority of the legal voters of the city was necessary to confer the authority. The returns of that election were offered in evidence, from which it appeared that more than thirteen thousand voters participated therein, while only five thousand and thirty-five persons voted for granting the license, and two thousand and one persons voted against it. This court held, that a majority of the legal voters had not voted for the proposition. Had the election been a special one, and no vote been cast but on the refreshment act, that vote would

doubtless have been held to be *prima facie* evidence of the number of legal voters.

In the case of the *State v. The Mayor of St. Joseph,* no attempt was made to show that the voters voting for the proposition, were not two-thirds of the qualified voters of the city. In the *State v. Binder,* the same refreshment act and the same election, which were considered in the *State v. Winkelmeier,* were again before the court. This time, however, the returns of the election held for city officers were not offered in evidence, and the only list of voters before the court, was the list of those voting for and against the proposition to grant permission to sell refreshments on Sunday. "This was the whole evidence," said the court, "concerning the election and the vote." After referring approvingly to the *State v. Winkelmeier* and the *State v. The Mayor of St. Joseph,* the court used among others, the following expression: "And certainly, *in the absence of any evidence to the contrary,* it may be presumed that the voters voting at an election so held were all the legal voters of the city." I do not think, therefore, that it can be justly claimed that prior to the passage of the act of 1868, the rulings of this court were to the effect that the list of voters voting at an election, was *conclusive* evidence of the number of qualified voters.

I am of opinion that the judgment of the circuit court should be reversed and the cause remanded for a new trial.

NAPTON, J.—I was not on the bench during the argument of the township bond cases, in the winter of 1876–7, because of a dislocation of my wrist, which confined me to my room and bed, and therefore cannot give any opinion upon some of the topics discussed by my colleagues. I have always been in favor of arresting the issue of municipal bonds when there was a reasonable question as to the power of the court to issue them.

In regard to the construction of the act of March 23rd,

1868, when considered in connection with subscriptions made and bonds issued, I may be allowed to say now, to prevent misapprehension of my views, that I concur in the opinion of Waite, C. J., in the case of *Cass County v. Johnson*, at the present term of the Supreme Court of the United States.