

# SUPREME COURT OF MISSOURI
# en banc

JOSHUA PETERS,                  )
                                  )

          Respondent,            )
                                  )

THE MISSOURI ATTORNEY GENERAL,    )
                                  )

          Intervenor/Respondent,    )
                                  )

v.                                 )       **No. SC95678**
                                  )

RACHEL JOHNS,                )
                                  )

          Appellant.             )

## APPEAL FROM THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
The Honorable Julian L. Bush, Judge

*Opinion issued May 20, 2016*

Article III, section 4 of the Missouri Constitution provides that a state representative must have been a "qualified voter" for two years prior to the day of the representative's election, which necessarily means that the representative must have been registered to vote during that time. In this appeal, Rachel Johns, a candidate for the office of state representative, challenges the "qualified voter" requirement as violating the First and Fourteenth Amendments of the federal constitution by penalizing her for engaging in protected speech, denying her access to the ballot, burdening the voting

rights of herself and other voters of District 76, and unjustifiably denying her the equal protection of the law.

This Court finds that the "qualified voter" requirement is constitutional. Johns' failure to register to vote does not constitute "symbolic speech" subject to First Amendment protection because it is not conduct that is inherently expressive. Nor does the requirement unjustifiably burden Johns' right to run for office or the voting rights of Johns and the other voters in her district because it imposes only a *de minimis* burden on those rights by temporarily delaying Johns' ability to seek office and the voters' corresponding opportunity to vote for her. The "qualified voter" requirement is a state constitutional provision adopted by voters that serves the legitimate interests of requiring candidates to take certain minimal steps to demonstrate their seriousness about engaging in Missouri's political, social, and civic processes. The judgment is affirmed.

## I. Factual & Procedural Background

The facts in this case are undisputed. Rachel Johns seeks the Democratic party's nomination for Missouri State Representative in the District 76.[1] She filed a declaration of candidacy with the Missouri Secretary of State, in which she stated under oath, that she "will qualify" to hold the office of state representative pursuant to the Missouri Constitution's requirements for that office.

---

[1] The primary election is August 2, 2016. The person nominated will appear on the ballot for the general election on November 8, 2016.

Respondent Joshua Peters,[2] another candidate for the Democratic party's nomination for Missouri State Representative in the District 76, filed a petition pursuant to section 115.526, RSMo 2000, with the Circuit Court of the City of St. Louis seeking to disqualify Johns as a candidate and have her name removed from any official election ballot. Peters argued that Johns cannot meet the two-year durational voter registration requirement of article III, section 4 of the Missouri Constitution because she did not register to vote until February 4, 2015, which is less than two years before the general election date of November 8, 2016.

Although Johns agreed that she does not meet the two-year voter registration requirement, she argued that such requirement is constitutionally invalid as applied to her. She contended the requirement, by temporarily disqualifying her from running for office, penalized her for engaging in an act of political expression protected by the First Amendment to the United States Constitution as incorporated by the Fourteenth Amendment. Johns also argued that the requirement unconstitutionally burdened the voting rights of herself and the voters of the District 76. The parties filed cross-motions for judgment on the pleadings. The circuit court determined that the voter registration requirement did not violate the First or Fourteenth Amendments. Johns appeals.[3]

---

[2] Peters is currently serving as the state representative from this district and is seeking reelection. Additionally, this Court granted the State's motion to intervene in this appeal. The American Civil Liberties Union (ACLU) also appears, as amicus, on behalf of Johns.

[3] This Court has exclusive jurisdiction of the appeal. MO. CONST. art. V, sec. 3.

3

## II. Standard of Review

The constitutional validity of a statute is a question of law subject to *de novo* review. *Geier v. Mo. Ethics Comm'n*, 474 S.W.3d 560, 564 (Mo. banc 2015). Similarly, the validity of a provision of the Missouri Constitution is also a question of law subject to *de novo* review. *See Brown v. Carnahan*, 370 S.W.3d 637, 647 (Mo. banc 2012) (constitutional provisions are subject to the same interpretive rules as other laws).

## III. Analysis

### A. A "Qualified Voter" in Article III, Section 4 is a Registered Voter

The issue on appeal is whether the durational voter registration requirement of article III, section 4 violates the constitutional rights of Johns and the voters of District 76.[4] Before turning to the constitutional issues, the Court must first address the meaning of the term "qualified voter" in the challenged provision. Article III, section 4 of the Missouri Constitution, titled "Qualifications of representatives," states:

> Each representative shall be twenty-four years of age, *and next before the day of his election shall have been a qualified voter for two years* and a resident of the county or district which he is chosen to represent for one year, if such county or district shall have been so long established, and if not, then of the county or district from which the same shall have been taken.

---

[4] Johns also challenges section 21.080, RSMo 2000 ("qualifications of representatives"), which tracks the language of article III, section 4 except that the statute requires a representative to have been a "voter" for two years rather than a "qualified voter." When the constitution sets out the requirements for a particular office, the constitutional provision controls over any additional or different qualifications set out by the legislature. *Labor's Educ. & Political Club-Indep. v. Danforth*, 561 S.W.2d 339, 343 (Mo. banc 1977). This Court holds that section 21.080 restates the requirements of article III, section 4 despite its failure to use the term "qualified." As such, this opinion will reference only article III, section 4.

(emphasis added). The ACLU argues that the term "qualified voter" should not be interpreted to mean a registered voter but, rather, any individual who possesses the constitutional qualifications to vote, even if unregistered.

To determine the meaning of the term "qualified voter" and its relationship to voter registration, a brief history of the Missouri Constitution is helpful. Under the 1875 constitution, the term "qualified voter" was used in two ways. First, as with the provision at issue here, "qualified voter" was used to describe the qualifications to hold legislative and judicial offices.[5] The second use of "qualified voter" was to describe who elected those and other officials.[6] Under the 1875 constitution, those entitled to vote were, generally, "male citizen[s] of the United States" over the age of 21 years who had, prior to the election in which they wished to vote, resided in Missouri for one year and the relevant county, city, or town for 60 days. MO. CONST. art. VIII, sec. 2 (1875). Voter registration was not listed as a requirement because, at that time, registration was required for only the most populous areas. MO. CONST. art. VIII, sec. 5 (1875).

Accordingly, under the 1875 constitution, the term "qualified voter" would have included all those who could appear at the polls and vote on election day, and whether such persons were registered depended on where they lived. There can be no doubt,

---

[5] *See e.g.* MO. CONST. art. IV, sec. 4 (1875) (state representatives to be qualified voters for two years prior to election); art. IV, sec. 6 (state senators to be qualified voters for three years prior to election); art. VI, sec. 26 (circuit judges to be qualified voters for three years prior to election).
[6] *See e.g.* MO. CONST. art. IV, sec. 2 (1875) (state representatives chosen every second year by qualified voters); art. IV, sec. 5 (state senators chosen by qualified voters of their districts); art. VI, sec. 5 (supreme court judges elected by qualified voters of the state); art. VI, sec. 25 (circuit court judges elected by qualified voters of each circuit).

5

however, that where registration *was* in place, the fact of being registered was considered a requirement to be a qualified voter. This much is clear from this Court's decision in *State ex rel. Woodson v. Brassfield*:

> While the registration law was in force, they only were qualified voters whose names were placed on the registration books. This was the final, qualifying act, and no matter if a citizen possessed every other qualification, if not registered, he was not a qualified voter. It was not the right to register which constituted one a qualified voter, but the fact of being registered as such, was also essential. A qualified voter is one who by law, at an election, is entitled to vote. If, by the law, a person was not entitled to vote, whether in consequence of a disability which deprived him of the right to register, or of his neglect to register with a perfect right to do so, he was equally disqualified.

67 Mo. 331, 336-37 (Mo. 1878).

That a qualified voter in an election is one who is registered when and where registration is required is further apparent under the current constitution, adopted in 1945. Article VIII, section 2 now states that all United States citizens over the age of 18 years who are residents of Missouri and of the political subdivision in which they seek to vote "are entitled to vote at all elections . . . *if the election is one for which registration is required* if they are registered within the time prescribed by law . . . ." MO. CONST. art. VIII, sec. 2 (emphasis added). Because there is no question that, today, registration is required everywhere in the state to vote in a general election, the term "qualified voter" is synonymous with "registered voter" when used in the constitution to describe the electorate. And there is no indication that the drafters of the constitution intended the term "qualified voter," when used to describe the electorate, to mean something different

6

from when it is used as a qualification to hold office. As a result, where the constitution uses the term "qualified voter" as a requirement to hold political office, that term means registered voter. This has long been the settled interpretation in Missouri law,[7] and that interpretation is now reaffirmed.

### B. Johns' Equal Protection Argument Was Not Preserved

Recognizing that she does not meet the two-year voter registration requirement imposed by article III, section 4, Johns asserts that the voter registration requirement is invalid under the United States Constitution.[8] As an initial matter, this Court must discern precisely what constitutional challenges Johns raises and which are properly preserved for review. In her motion for judgment on the pleadings before the circuit court, Johns stated that she was raising "two distinct bases for her constitutional challenge." First, she asserted that the requirement unconstitutionally penalized her, by disqualifying her candidacy, for engaging in protected speech—electing not to register to vote as an act of political protest. She also argued the requirement unconstitutionally burdened both her own voting rights and the voting rights of the voters of District 76. These challenges were ruled on by the circuit court and are preserved for review.

---

[7] *See Woodson*, 67 Mo. at 336-37 (Mo. 1878); *State ex rel. Burke v. Campbell*, 542 S.W.2d 355, 357-58 (Mo. App. 1976); *State ex rel. Mason v. Cnty. Legislature*, 75 S.W.3d 884, 887-88 (Mo. App. 2002).

[8] This appeal is hampered by the fact that Johns' point relied on is clearly multifarious, containing more than one basis for reversal. Multifarious points relied on are noncompliant with Rule 84.04(d) and preserve nothing for review. Nevertheless, this Court gratuitously exercises its discretion to review the defective point and resolve the issues on the merits.

On appeal, Johns now additionally argues that the voter registration requirement violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by creating an unjustified classification between long-term registered voters (those registered to vote for at least the two years preceding the next general election) and recently registered voters (those registered to vote for less than two years preceding the next general election).

To properly raise a constitutional challenge, a party must: (1) raise the constitutional question at the first opportunity; (2) state with *specificity* the constitutional provision on which the challenge rests; (3) set forth facts showing the violation; and (4) preserve the question throughout the proceedings for appellate review. *Mayes v. Saint Luke's Hosp. of Kansas City*, 430 S.W.3d 260, 266 (Mo. banc 2014). This rule is intended to prevent surprise to the opposing party and to accord the circuit court an opportunity to fairly identify and rule on the issue. *Id.*

Johns' pleadings undoubtedly did not state with specificity an equal protection challenge. Although she clearly stated "two distinct bases" for her challenge, an equal protection violation based on a classification between similarly situated voters was not one of them. Regardless, she asserts that her general citation of the Fourteenth Amendment was sufficient to raise her equal protection claim, as the Equal Protection Clause is embedded within that amendment. Citing the Fourteenth Amendment generally, however, does not meet the requisite specificity for preservation. The Fourteenth Amendment has several provisions, including the Due Process Clause. In

8

light of Johns' First Amendment claims, it is evident from her pleadings that her general citation to the Fourteenth Amendment was only as a means of applying the First Amendment to the State of Missouri, through the Due Process Clause. *See Gibson v. Brewer*, 952 S.W.2d 239, 246 (Mo. banc 1997) ("the First Amendment applies to the states by incorporation into the Fourteenth Amendment").

Johns is correct that her pleadings below cited ballot access cases that employed equal protection analysis. In particular, she relied on *Labor's Educ. & Political Club-Indep. v. Danforth* for the proposition that the Equal Protection Clause requires the application of strict scrutiny to a provision denying "the right to run for public office based on the particular office sought." 561 S.W.2d 339, 348 (Mo. banc 1977). However, she did not state that she suffered an equal protection violation. Without specifically citing such a violation, it is simply untenable to argue that the circuit court was fairly presented the opportunity to decide this issue. Indeed, the circuit court's judgment ruled on every other argument in her pleadings but did not mention equal protection.

The Court is sensitive to the accelerated timetable on which these election cases are decided. Yet the rules of preservation are clear. Because Johns failed to raise an equal protection challenge with any specificity at the earliest opportunity, it is waived. *Mayes*, 430 S.W.3d at 266.

*C. Johns' Failure to Register to Vote Does Not Invoke First Amendment Protection*

Johns contends that the two-year durational voter registration requirement violates her rights under the First Amendment to the United States Constitution because it

9

imposes a penalty on her – disqualifying her from running for office – for engaging in speech. The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that Congress "shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. Laws that burden political speech are subject to strict scrutiny, which requires the government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). Johns, as the party asserting a free speech claim, must first demonstrate – beyond a "plausible contention" – that the First Amendment applies. *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

The "speech" that Johns argues is burdened, or penalized, by the voter registration requirement is her failure to register to vote. Of course, she does not assert that intentionally failing to register to vote is literally "speech" as one might commonly understand that term. Rather, her claim falls under the "symbolic speech" jurisprudence, in which the Supreme Court has recognized that some conduct may be sufficiently expressive so as to bring it within the First Amendment's protection. *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 65 (2006). To that end, Johns argues that her failure to register to vote was an act of political expression. She asserts that she intentionally did not register because to do so "would mean endorsing a system that had continued to fail her community."

10

In arguing that her conduct of failing to register to vote was sufficiently expressive to merit First Amendment protection, Johns relies on *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999). In *Buckley*, the Supreme Court struck down, under the First Amendment, a provision of a Colorado law that required the circulators of initiative petitions to be registered voters. *Id.* at 197. The State attempted to justify the law by asserting an interest in policing lawbreakers among petition circulators. *Id.* at 196. In other words, Colorado's justification was that a voter registration requirement would ensure that circulators of initiative petitions would be "amenable to the Secretary of State's subpoena power." *Id.* The State admitted the law burdened political speech because it reduced the number of individuals who could circulate initiative petitions. *Id.* at 195. It argued, however, that the burden was minimal because registering to vote was "exceptionally easy." *Id.*

The Supreme Court found that the State's "ease of registration" argument missed the point because some of the plaintiffs in the case testified that they intentionally did not register to vote as an act of political protest. *Id.* at 195-96. Johns seizes onto this aspect of *Buckley* to argue that failure to register to vote is protected by the First Amendment when done for the purpose of political protest. Her reliance is misplaced and mischaracterizes the holding of *Buckley*. The Supreme Court in *Buckley* did not hold, nor even discuss, whether the plaintiffs' claimed failure to register out of protest constituted expressive conduct. That was not the issue in *Buckley*. The speech burdened by the voter registration requirement in *Buckley* was not the ability to engage in a political protest by

11

not registering to vote; rather, it was the circulation of initiative petitions. In that regard, the Supreme Court found that the circulation of initiative petitions was "core political speech" for which First Amendment protection was "at its zenith." *Id.* at 186-87. Because the speech at issue was at the core of the First Amendment's protection, and because the State's interest in policing lawbreakers could be adequately met by other provisions of the Colorado law, the Supreme Court struck down the voter registration requirement. *Id.* at 197.

*Buckley* does not aid Johns because the Supreme Court engaged in no analysis of whether the intentional failure to register to vote constituted "symbolic speech." This Court must now address that question. While some conduct may be sufficiently expressive to be protected under the First Amendment, the Supreme Court has rejected the view that a "limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968). Rather, First Amendment protection extends only to conduct that is "inherently expressive." *Rumsfeld*, 547 U.S. at 66. "Inherently expressive" conduct is that which possesses sufficient communicative elements to bring the First Amendment into play. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). This Court must ask whether "an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Id.*

Johns' failure to register to vote does not qualify as symbolic speech. On this record, the only evidence that her failure to register was motivated by a desire to protest

12

the political system is her own statements to that effect.  While this Court does not doubt the sincerity of Johns' motivations both in abstaining from political involvement and now seeking an active role in government, the record is devoid of any communicative elements accompanying her conduct to activate First Amendment protections.  The law of symbolic speech clearly teaches that there must be more than mere conduct.  *See, e.g., Rumsfeld*, 547 U.S. at 66 (law schools' exclusion of military recruiters was only expressive when accompanied by explanatory speech).  The failure to register to vote is actually the absence of conduct.  Johns does not assert that anyone viewed the voter registration records and observed her absence therefrom.  Further, she does not allege that she told anyone that she intentionally did not register, much less that she did so as an act of protest.  Without more, there is simply no basis under the First Amendment to hold that Johns' failure to register as an act of protest was any different from anyone else's failure to register simply out of neglect or indifference.[9]  Because Johns' failure to register to vote does not invoke First Amendment protection, her challenge to article III, section 4 on this basis fails.

*D. Article III, Section 4 Does Not Violate Johns' Candidacy or Voting Rights*

Johns' second challenge to article III, section 4's two-year durational voter registration requirement encompasses a number of overlapping constitutional rights

---

[9] The case was submitted to the circuit court on stipulated facts.  As a result, Johns argues that Peters stipulated to her assertion in her pleadings that the decision not to register to vote was an "expressive act of protest."  Despite this stipulation, it is still a question of law for the circuit court as to whether her conduct merited First Amendment protection.

13

derived from the First and Fourteenth Amendments. When considering a challenge to a ballot access statute, the Supreme Court has set forth the applicable analysis:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. Instead, a court must . . . first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Accordingly, this Court must weigh the character and magnitude of the asserted injury against the interests put forth by the State to justify the burden imposed by the law.[10]

### 1. The Constitutional Rights at Issue

In beginning the analysis, it must be first determined what constitutional rights are implicated. Johns' claim is two-fold. She argues that article III, section 4 burdens her own access to the ballot *as a candidate* as well as the voting rights of the voters in her district. The rights of a candidate and the rights of voters are distinct, and the difference is significant. A candidate's right to access the ballot (i.e., run for office) is not a

---

[10] Although, as stated above, this opinion is based directly on the First and Fourteenth Amendments and does not engage in a separate Equal Protection Clause analysis, this decision necessarily relies, as did the *Anderson* Court, on the analysis of a number of cases applying the "fundamental rights" strand of equal protection law. *See Anderson*, 460 U.S. at 786 n.7.

14

fundamental right.[11]  The right to vote, however, is fundamental.  *Beil v. City of Akron*, 660 F.2d 166, 169 (6th Cir. 1981).  It is crucial to determine, however, what voting rights are actually implicated by a candidacy restriction.

A durational voter registration requirement as a candidacy restriction does not limit a voter's ability to cast a vote.  Regulations that limit the right to vote properly fall within the body of law addressing durational voter requirements under the United States Constitution's "right to travel."[12]  These cases employ a different analysis than that which is required to address article III, section 4, which is a *candidacy regulation* because it acts to limit the number of candidates who may appear on a ballot.[13]  Notwithstanding this key distinction, the Supreme Court has held that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."  *Bullock v. Carter*, 405 U.S. 134, 143 (1972).  Accordingly, candidacy restrictions do affect, to some degree, the First Amendment *associational* rights of voters, sometimes referred to as the voters' right to "cast their votes effectively."  *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).  *See also Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (Election laws, whether they govern the

---

[11] Both this Court and the United States Supreme Court have held that the right to seek office is not fundamental, and Johns does not disagree.  *See Coyne v. Edwards*, 395 S.W.3d 509, 517 (Mo. banc 2013) (citing *Clements v. Fashing*, 457 U.S. 957, 964-65 (1982)).

[12] *See, e.g., Dunn v. Blumstein*, 405 U.S. 330, 360 (1972) (Tennessee durational voter requirement violated the Equal Protection Clause because it burdened, without a compelling justification, the voting rights of bona fide residents who had recently moved to the state).

[13] *See Thournir v. Meyer*, 909 F.2d 408, 412 (10th Cir. 1990) ("election laws impacting upon the travel freedoms which have been invalidated by *Dunn* are not analogous to the statutes imposing burdens on candidacy").

15

qualifications of voters, the eligibility of candidates, or the voting process itself, inevitably affect "the individual's right to vote and his right to associate with others for political ends").[14]

## 2. Level of Scrutiny

Having determined the candidate and voter rights at issue, the next step is to ascertain the level of constitutional protection to which such rights are entitled. The critical inquiry here is choosing the correct level of scrutiny to apply—strict scrutiny or rational basis review. Under strict scrutiny, an election regulation will be upheld "only if it is narrowly tailored to serve a compelling state interest." *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 729-30 (9th Cir. 2015). By contrast, under rational basis review, when an election law imposes "only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434. Under this lesser standard, the Court evaluates only "whether the requirement is justified by a legitimate interest and is a reasonable way of accomplishing this goal." *Schulz v. Williams*, 44 F.3d 48, 57 (2d Cir. 1994).

The Eighth Circuit has recently noted that determining which level of scrutiny to apply is no simple task.

---

[14] Despite the fact that the voters of District 76 are not parties to this case, Johns has standing to assert their rights because, although she is a putative candidate, she also *is herself* a voter of District 76. *See McLain v. Meier*, 851 F.2d 1045, 1048 (8th Cir. 1988) (because he was a voter, candidate had a sufficient personal stake in the outcome of a challenge to state's ballot access laws).

16

> In considering a challenge to a ballot access statute, we are reminded ballot access statutes are not susceptible of easy analysis, nor is the appropriate standard of review always easy to discern. Although several cases address ballot access issues, no opinion from either the United States Supreme Court or the Eighth Circuit has clearly defined the appropriate standard for reviewing these constitutional challenges. Instead, each provides for a case-by-case assessment of the burdens and interests affected by a disputed statute . . . .

*Libertarian Party of North Dakota v. Jaeger*, 659 F.3d 687, 693 (8th Cir. 2011). It is tempting to assume the application of strict scrutiny due to the implication of voting rights, regarded as "among our most precious freedoms." *Williams*, 393 U.S. at 30. The Supreme Court has been clear, however, that "to subject every voting regulation to strict scrutiny . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. "Accordingly, the mere fact that a State's system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny." *Id.*

Rather, it is the *severity of the burden* on the asserted constitutional rights that produces the level of scrutiny, and not the nature of the burdened right itself, as is often the case in traditional fundamental rights analysis. *Id.* at 434. If the burden is severe, strict scrutiny applies. *Arizona Libertarian Party*, 798 F.3d at 729-30. If the burden is *de minimis*, rational basis review applies. *Id.* With this in mind, the Court now addresses the severity of the burdens placed on Johns' candidacy and on the rights of the voters of District 76 and weighs those burdens against the State's interests.

17

3. Johns' Access to the Ballot as a Candidate

The burden imposed on Johns' candidacy is not severe. Johns is now registered to vote, and absent some change in her status,[15] she will be eligible to run for office in the next general election in 2018. This durational voter registration requirement results in a temporary burden as it delays, but does not prevent, her candidacy. It is well-settled that such a delay is a slight burden. *See Clements*, 457 U.S. at 967 (requirement that a justice of the peace complete his four-year term before being eligible to run for election to the legislature did not violate the First Amendment because a waiting period "is hardly a significant barrier to candidacy"); *Stiles v. Blunt*, 912 F.2d 260, 265-66 (8th Cir. 1990) (requirement in article III, section 4 of Missouri Constitution that state representatives be 24 years old did not violate equal protection rights of underage putative candidate because the candidate was "not forever precluded from running").

Article III, section 4 is also nondiscriminatory. In two related strands of ballot access cases (albeit decided under the Equal Protection Clause), the Supreme Court's analysis has often focused on an election law's discriminatory impact.[16] The first strand of cases involves election laws, typically candidate filing fee schemes, that impose burdens unique to candidates and voters of lesser economic status. *Clements*, 457 U.S. at

---

[15] While Missouri does not provide for an individual to *un*register to vote, Johns could lose her right to vote if she were adjudged incapacitated, incarcerated, on probation or parole after commission of a felony, or convicted of a crime connected with "the right of suffrage." Section 115.133.2, RSMo Supp. 2013.

[16] *See Turner v. Fouche*, 396 U.S. 346, 363 (1970) (there is a "federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications").

18

964. The second strand involves laws that impose burdens on small political parties or independent candidates, typically requiring these parties or candidates to demonstrate a certain level of support among the electorate before obtaining a place on the ballot. *Id.* Though the case at hand is not decided under the Equal Protection Clause, the Court nonetheless notes that no such discriminatory concerns are presented by article III, section 4. The durational voter registration requirement applies to any putative candidate for state representative, regardless of economic status or political affiliation.

Given the minimal delay placed on Johns' candidacy by article III, section 4, the provision's nondiscriminatory impact, and the fact that the right to run for office is not fundamental,[17] rational basis review applies. Accordingly, the Court must ask "whether the requirement is justified by a legitimate interest and is a reasonable way of accomplishing this goal." *Schulz*, 44 F.3d at 57.

The Supreme Court recognizes that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Buckley*, 525 U.S. at 187. States have a legitimate, even compelling, interest in protecting the integrity of their electoral systems

---

[17] *See Coyne*, 395 S.W3d at 517. Furthermore, the inability to run for state representative does not impact the right to travel, as the dissenting opinion suggests. In *Chimento v. Stark*, the New Hampshire District Court upheld the state constitution's seven-year residency requirement for gubernatorial candidates. 353 F. Supp. 1211, 1218 (D. N.H. 1973), *aff'd without opinion*, 414 U.S. 802 (1973). The court found that it "cannot be seriously argued that the inability to run for Governor is a real impediment to interstate travel." *Id.* The court found that the candidate residency restriction was unlike the voter residency restriction at issue in *Dunn*, where the voter residency requirement *in fact* disenfranchised a large number of people. *Id.* "While the Governorship of New Hampshire may be a coveted prize, it is one that is seriously sought after by only a very few." *Chimento*, 353 F. Supp. at 1218.

from frivolous candidacies, ensuring that election processes are efficient, and avoiding voter confusion caused by an overcrowded ballot. *Libertarian Party of North Dakota*, 659 F.3d at 697. Though Johns argues that there are no actual concerns of frivolous candidacies or voter confusion presented here because she is sufficiently serious and is the only candidate opposing Peters. These concerns have repeatedly been recognized to be sufficient to justify reasonable restrictions on access to the ballot, and the State need make no showing of their actual existence in each particular case. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986) (Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access").

The State also argues that Missouri has an interest in encouraging candidates to show a level of commitment to the electoral process and exhibit meaningful social engagement and interest in Missouri civic affairs. At this point it must be noted that, in addition to the durational voter registration requirement, article III, section 4 also contains a requirement that state representatives be a resident of their chosen district for one year prior to election. The residency requirement ensures that state representative candidates are sufficiently familiar with the people and issues of the district they seek to represent. But the voter registration requirement is not a mere proxy residency requirement. It arguably serves a different purpose.

20

Unlike the residency requirement in article III, section 4, the voter registration requirement does not require a candidate to be registered in a particular district but, rather, is satisfied by two years of registration anywhere in Missouri.[18]  General elections in Missouri occur every two years.  As a result, this requirement addresses the seriousness of candidates in a general election by ensuring that they were eligible to vote in at least one preceding general election.

Johns and the dissenting opinion suggest that the State can have no interest in encouraging legislative officials to show a minimal level of commitment to the political system before being considered a serious, or non-frivolous, candidate for office.[19]  The

_____

[18] Article III, section 4 does not on its face require two years of voter registration in Missouri. The two-year durational voter registration requirement first appeared in the 1865 Missouri Constitution.  It originally required a state representative to be "a qualified voter *of this state* two years."  MO. CONST. art. IV, sec. III (1865) (emphasis added).  When the 1945 constitution was adopted, voters chose to omit the language "of this state."  MO. CONST. art. III, sec. 4 (1945). The Court declines to specifically hold that registration outside of Missouri would satisfy the requirement as that question is not before the Court.  However, the removal of the language "in this state" perhaps further underscores the notion that the provision has little to do with residency but, rather, is concerned with social and civic engagement.

[19] In arguing that voter registration bears no relationship to a candidate's seriousness, the dissenting opinion relies on *Gangemi v. Rosengard*, in which the Supreme Court of New Jersey struck down, on state equal protection grounds, a law requiring elected municipal officers in first class cities to be registered voters for two years prior to election.  207 A.2d 665 (N.J. 1965). That case is of little value here, as the *Gangemi* court struck down the law because it applied only to certain municipalities based on population and whether they were classified as a "city." *Id.* at 670.  Article III, section 4, makes no such arbitrary classification, and so *Gangemi* is of little help in evaluating the strength of the State's interest here.  More persuasive is Peters' citation of *Broadwater v. State*, in which the Maryland court of appeals recognized that "it would be anomalous for those who make and enforce the laws . . . to have so little interest in public affairs as not to be registered."  510 A.2d 583, 588 (Md. 1986).

Similarly, Johns relies on *Henderson v. Fort Worth Indep. Sch. Dist.*, in which the Fifth Circuit struck down, under the Equal Protection Clause, a local statute requiring school board officials to be registered voters in the district for three years prior to election.  526 F.2d 286, 293 (5th Cir. 1976).  In that case, the State's justification for the statute was a desire for

21

people of Missouri clearly disagree—it is noteworthy that the durational voter registration is a *constitutional* provision, adopted by the voters. It is not unreasonable for the people of Missouri to have decided that those who seek to govern should not only reside in the district they seek to represent, but also should take a simple step to demonstrate sufficient seriousness about Missouri's general election process and social and civic engagement at large. And, as discussed, the requirement has been a part of the Missouri Constitution since 1865 and has never before been challenged. While the "dead hand of the past should not be allowed to shape the future," if the registration requirement is to be eliminated, that task is better accomplished by the voters through the constitutional amendment process, not by courts. *Chimento*, 353 F. Supp. at 1217 ("something more than the disappointment of one frustrated candidate is needed to erase a constitutional provision that goes back to 1784 and was never challenged until now").

The two-year voter registration requirement is a reasonable method of addressing these legitimate interests because it ensures that a prospective legislator has taken the minimal steps necessary to be entitled to participate in the electoral process. The people of Missouri have, through multiple drafts of the state constitution, decided that a

knowledgeable candidates able to handle the complex matters of the office. *Id.* at 292. The court was not persuaded, finding that voter registration was a "crude index" for such qualifications and that the regulation likely disqualified a significant number of residents of the district from the office. *Id.* Again, this case is meaningfully distinct. The State here does not argue that voter registration is related to any specific skill or knowledge inherent in serving as a capable legislator. Rather, the State believes that eligibility to vote in one preceding general election is some minimal evidence that a candidate is serious about Missouri's political system. Indeed, this is perhaps why the voter registration requirement, unlike that at issue in *Henderson*, does not require a candidate to be registered *in his respective district* for two years.

22

commitment to the state's political system is some evidence of a candidate's seriousness. In light of the fact that the State clearly cannot mandate civic involvement or voting as requirements for political office, a two-year voter registration requirement is a reasonable and minimally intrusive method of encouraging such interests. Further, "registration for primary election voters and candidates for political office are 'classic' examples of permissible regulation." *Buckley*, 504 U.S. at 196. When viewed realistically, the two-year voter registration requirement acts as only a *de minimis* burden on Johns' ability to participate in the election process. Accordingly, article III, section 4 does not violate the First or Fourteenth Amendment on this basis.[20]

### 4. Voting Rights of Voters of District 76

As with Johns' access to the ballot as a candidate, in evaluating the impact of the voter registration requirement on the voters of District 76, the Court must look to the severity of the burden placed on voting rights to determine the level of scrutiny. Again, "the mere fact that a State's system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny." *Burdick*, 504 U.S. at 433. Rather, when voting rights are at issue, the Court's task is to "examine in a realistic light the extent and nature of [the candidacy restriction's] impact on voters." *Anderson*, 460 U.S. at 786.

---

[20] The State also argues that it was Johns' voluntary decision not to register to vote. Because she is presumed to know the law, the State posits that she was aware of the durational voter registration requirement for candidacy for state representative and cannot now complain.

Johns argues that she and other voters of District 76 cannot cast their votes effectively if she is stricken from the ballot because Peters will then be the only candidate remaining on the primary ballot. The Supreme Court, however, has never held that the removal from the ballot of one candidate constituted a severe burden on voter choice. Moreover, voters do not have a right to support a specific candidate. *See Anderson*, 460 U.S. at 792 n.12 ("Although a disaffiliation provision may preclude such voters from supporting a particular ineligible candidate, they remain free to support and promote other candidates who satisfy the State's . . . requirements"); *Blunt*, 912 F.2d at 266 (the "fundamental rights of voting, speech, and association do not confer upon [voters] an absolute right to support a specific candidate regardless of whether he or she has satisfied reasonable eligibility requirements"); *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) ("A voter has no right to vote for a specific candidate or even a particular class of candidates"). Given that this case concerns only Johns' inability to seek the office of state representative in 2016, it cannot be said that her removal from the ballot "adversely affect[s] the democratic election process or the voters' participation therein." *Chimento*, 353 F. Supp. at 1218.

Like the *de minimis* burden on Johns herself, the burden on voters is also *de minimis*. Article III, section 4's nondiscriminatory[21] durational voter registration

---

[21] As previously discussed, the provision would temporarily delay any candidate who did not timely register to vote, regardless of the candidate's economic status or political affiliation.

24

requirement does not impact the right of the voters to vote, it only temporarily delays their ability to vote for Johns. Accordingly, rational basis review follows.

The State's justification for the durational voter registration requirement's burden on voting rights is the same as the justification it offers for the burden on Johns herself. The State's interests in regulating the fairness of its elections and ensuring that candidates for state representative demonstrate sufficient seriousness about the electoral systems and social and civic engagement are legitimate. The two-year durational voter registration requirement is rationally related to those interests and a reasonable method of furthering them. Accordingly, article III, section 4 does not violate the First Amendment voting rights of the voters of District 76.

### Conclusion

The circuit court's judgment is affirmed.

_____
Mary R. Russell, Judge

Fischer, Draper, and Wilson, JJ., concur;
Stith, J., dissents in separate opinion filed;
Breckenridge, C.J., and Teitelman, J., concur in opinion of Stith, J.

25



# SUPREME COURT OF MISSOURI
## en banc

JOSHUA PETERS,                   )
                                    )

        Respondent,            )
                                      )

THE MISSOURI ATTORNEY GENERAL,  )
                                      )

        Intervenor/Respondent,    )     No. SC95678
                                      )

vs.                               )
                                      )

RACHEL M. JOHNS,          )
                                      )

        Appellant.            )

## DISSENTING OPINION

I concur in the principal opinion's holding that Ms. Johns does not state a First Amendment claim for violation of her free speech rights. I disagree with the principal opinion's determination that Ms. Johns does not state a claim for violation of her First and Fourteenth Amendment rights and the rights of voters in her district to vote for a candidate of their choice in the upcoming election.

I. **Missouri's Two-Year Durational Voter Registration Requirement Is Invalid because it Places an Unnecessary and Substantial Burden on Ms. Johns and Voters**

    *A. A Multi-Factor Test Must be Used to Determine Whether a Law Imposes a Substantial Burden on the Rights of Voters and on Ms. Johns*

Ms. Johns correctly notes that the Supreme Court has held that restrictions on the right to run for public office implicate not only a potential candidate's right to seek

government office, but also "'burden[] … the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.'" *Anderson v. Celebrezze, 460 U.S. 780, 787 (1983), citing, Williams v. Rhodes, 393 U.S. 23, 30–31 (1968).* "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock v. Carter, 405 U.S. 134, 143 (1972).* "[T]hese rights of voters are fundamental." *Celebrezze, 460 U.S. at 788.* "[V]oting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi, 504 U.S. 428, 433 (1992).*

The Supreme Court has described the process this Court must use when evaluating challenges to election laws as follows:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. Instead, a court must … first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. ***In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.*** Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Celebrezze, 460 U.S. at 789* (emphasis added).

In other words, a court cannot simply do what the majority does here and consider in the abstract whether it believes that a two-year delay in the right to run for office imposes a substantial burden on the rights of would-be candidates and voters, or whether instead such a burden, because not permanent, is inherently *de minimus*. Such an

2

approach to the analysis is incomplete. Rather, in all cases alleging an election restriction is constitutionally invalid a court must weigh the burden *in context* by considering all three factors set out in *Celebrezze* before determining whether the burden is sufficiently substantial to require strict scrutiny or sufficiently *de minimus* in context so that rational basis scrutiny is permissible.

This means that first, this Court must identify "the *character and magnitude of the asserted injury* to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Id.* (Emphasis added). The Court cannot stop there, however. It, then, must continue its analysis so it can "identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule … [and] determine the *legitimacy and strength* of each of those interests …." *Id.* (Emphasis added). Finally, in assessing the legitimacy and strength of the State's interest, this Court must also "consider the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Id.* (Emphasis added).

In other words, the substantiality of the burden depends on the strength and legitimacy of the State's interests, and whether it is necessary to burden plaintiff's rights to achieve these interests. If the interest is minimal or the necessity of imposing the burden questionable, then the burden is more likely to be substantial than where the interest protected is high and its connection to and the necessity for the burden to protect that interest is great. Only after undertaking this analysis will a court be in the position to determine whether to apply strict or rational basis scrutiny, and only then will a court be in a position to determine whether that restriction is constitutional. *Id.*

3

In *Bullock,* the Supreme Court undertook this analysis and determined that, while barriers to voting do not automatically require the use of strict scrutiny, they did in that case because the high filing fees at issue there would as a practical matter exclude many candidates from running for office and would substantially limit the voters' choice of candidates. *405 U.S. at 143–44.* *Bullock* therefore applied strict scrutiny, and struck down the filing fee laws.

Similarly, here, to determine whether strict scrutiny will apply, this Court must "examine in a realistic light the extent and nature" of the impact of the durational voter registration requirement on voters. *Id. at 143*. "[T]he severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied …."*Arizona Libertarian Party v. Reagan, 798 F.3d 723, 729 (9th Cir. 2015).* If that burden is severe, strict scrutiny applies, which means that "any severe restriction [must] be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed, 502 U.S. 279, 289 (1992).* If the burden is *de minimis*, rational basis review applies, and the restriction will be stricken down if arbitrary and not rationally related to the state's identified purpose. *Arizona Libertarian Party, 798 F.3d at 729*.

Application of the *Celebrezze* factors to the current facts demonstrates that the burden on Ms. Johns and on the voters is far greater than acknowledged by the majority, the interests the State gives as justification for its implementation do not outweigh this burden and the burden is not necessary to effectuate those interests. Therefore, strict scrutiny applies.

4

*B.  The Two-Year Voter Registration Requirement Imposes a Substantial Burden*

The majority opinion, like the Respondent, asserts that because the two-year voter registration requirement lasts, by definition, "only" two years, it should be considered merely a "temporary" hurdle to running for office and so inherently is not substantial. Ms. Johns can simply wait until the next election to run for office, they say, and what difference will two more years make?

Of course, every durational voter registration requirement merely delays rather than forever bars a candidate from running for office.  If this were a sufficient basis in itself to hold that the burden imposed by such durational voter registration requirements were not substantial, then no durational restriction would ever be subjected to strict scrutiny, for a time-based limitation is, inherently, limited in time.  No court, prior to today, has suggested that a state has such a *carte blanche* to impose temporal registration restrictions on who may run for office.  To the contrary, as just discussed, a multi-factor weighing process must be undertaken, for which the mantra of "temporary burden" is not an adequate substitute.

Moreover, the description of the burden as only causing a two-year delay in running for office is not accurate.  The statute does require that one who runs for office must have been registered for two years, but that actually results in far more than a two year delay in seeking office where, as here, the office the challenger seeks to hold is one that requires re-election every two years. That is because even if a potential challenger registered to vote the week after the 2014 election, that person would not be able to meet the two-year registration requirement for running in the 2016 election.  The challenger

5

would have to wait until 2018 to run. That is nearly what occurred here, for Ms. Johns registered to vote a mere three months after the 2014 election, but that was not soon enough. She will have had to wait some 45 months before she can be elected to office should the voters wish to choose her as their state representative, a substantial burden on her right to run for office and on the right of voters to vote for her.

The Fifth Circuit addressed a very similar issue involving the validity of a three-year voter registration requirement to run for school board in *Henderson v. Ft. Worth Indep. Sch. Dist., 526 F.2d 286 (5th Cir. 1976).* If such "temporary" delays in running for office were inherently *de minimus,* as the majority here holds, then the Fifth Circuit's analysis would have been short and swift; it would have said that a mere three-year delay is not substantial because it imposes only a temporary delay and, therefore, is subject only to rational basis review. This is not what the Fifth Circuit did, however. Instead, it undertook the type of analysis required by *Celebrezze* and that I implore this Court to undertake here.

Applying this more appropriate analysis, the Fifth Circuit held the operative factor in determining whether a burden is substantial was not that the restriction delayed candidacies only for a three-year period, but rather that during those three years the restriction created a bar that was "absolute in its operation" for those who had not registered three years in advance. *Id. at 291–92.* For this reason, "[the restriction] denies access to what must be assumed is a significant number of potential school board candidates, and on that basis the statute's impact on voters is *substantial*." *Id. at 292* (emphasis added). *Henderson* went on to invalidate the restriction as not sufficiently

6

related to the purposes identified to justify this substantial burden.  *Id.*

It is not surprising that *Henderson* reached this result, for in other contexts the United States Supreme Court has recognized that burdens on the exercise of rights resulting from statutes imposing temporal limitations do impose substantial burdens.  For instance, *Shapiro v. Thompson, 394 U.S. 618, 627, 638 (1969), overruled on other grounds by Edelman v. Jordan 415 U.S. 651, 670–71 (1974)*, held that a one-year residency requirement before being eligible for welfare assistance in the District of Columbia violated the equal protection clause.  Similarly, *Memorial Hosp. v. Maricopa Cnty, 415 U.S. 250, 251 (1974),* struck down a one-year residency requirement as a condition to receiving nonemergency hospitalization or medical care at the county's expense as a violation of the equal protection clause.  Although the latter two cases were decided based on the burden imposed on different rights than are at issue in the case at hand today, they show the flaws in the reasoning used by the majority to uphold the voter registration requirement in this case – that the restriction is only for two years, and such a temporary delay in being allowed to assert ones rights inherently does not impose a substantial burden.

To the contrary, simply because the burden a restriction imposes is temporary does not end our inquiry.  This Court still must look at the effect the durational requirement has on the rights of Ms. Johns and voters and weigh that against the interests of the State.

The two cases relied on by the majority to support its contrary reasoning that temporarily delaying candidates from running for office only poses a "slight burden" on candidates and voters – *Clements v. Fashing, 457 U.S. 957 (1982)*, and *Stiles v. Blunt,*

7

*912 F.2d 260 (8th Cir. 1990)* – are not on point. In *Clements*, the Supreme Court upheld a Texas statute requiring a sitting justice of the peace to complete his term before being eligible to run for a legislative seat because it was reasonable to require a current office holder to finish his term before running for a new office. For this reason, "[i]n establishing a maximum 'waiting period' of two years for candidacy by a Justice of the Peace for legislature, [the statute] places a *de minimis* burden on the political aspirations of a *current* office holder." *457 U.S. at 967* (emphasis in original). Furthermore, the substantial interest that Texas sought to vindicate in restricting sitting justices of the peace from running in legislative races in *Clements* has no application here. In *Clements,* the legitimate concern was raised that:

> The demands of a political campaign may tempt a Justice of the Peace to devote less than his full time and energies to the responsibilities of his office. A campaigning Justice of the Peace might be tempted to render decisions and take actions that might serve more to further his political ambitions than the responsibilities of his office. The State's interests are especially important with regard to judicial officers. It is a serious accusation to charge a judicial officer with making a politically motivated decision.

*Id. at 968.* Here, of course, Ms. Johns is not a current officeholder, nor is there any indication she has ever held office, nor can she hold elective office as a state representative until at least 2018 under the current scheme.

*Stiles*, similarly, is distinguishable. In *Stiles*, the Eighth Circuit upheld a requirement that a person running for state representative must be 24 years old. *912 F.2d at 265–66.* Of course, as all people do grow older, their being any particular age is "temporary," as the Eighth Circuit noted. *Id. at 266.* The Eighth Circuit did not hold this was itself a sufficient basis, however, to uphold the age limitation on running for office.

8

It went on to consider *Celebrezze's* requirement that a court assess the strength and legitimacy of the State's interest and compare it with the right being temporarily restricted. In *Stiles*, these interests were rather clear: Missouri has an interest in having candidates who have "some degree of maturity and life experience" and there is a correlation between age and maturity. *Id. at 267*. The age limitation, therefore, was directly related to the nature of the State's interest. *Id. at 267–68*.

Here, Missouri's "temporary" voter registration requirement is comparable to the "temporary" restriction stricken in *Henderson* and is just as great a burden on the rights of voters as are other stricter durational restrictions on other fundamental rights that, for similar reasons have been held unduly burdensome. *See, e.g., Shapiro, 394 U.S. at 627, 638 (1969)*; *Memorial Hospital, 415 U.S. at 251*. Further, like in *Henderson*, the two-year voter registration requirement denies access to *anyone* who has failed to register to vote more than two years before the next election, and imposes a ban on running for office that has no exceptions and "absolute in its operation" during that two-year period.

Pursuant to the test set forth in *Celebrezze,* this Court therefore must turn to consider the "precise interests put forward by the State as justifications for the burden imposed by [this] rule." *460 U.S. at 789*. It then must "determine the legitimacy and strength of each of [the State's] interests … [and] must consider the extent to which those interests make necessary to burden the plaintiff's rights." *Id.* "Only after weighing all of these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." *Id*. As explained below, this analysis shows that this burden is not necessary to protect Missouri's identified interest in requiring two-year

9

voter registration for potential state representatives – to ensure serious and committed candidates.

## C. The Interests Identified by the State In Having Civic-Minded Citizens Run for Office are Not Furthered by the Two-Year Voter Registration Restriction

Respondent argues in his brief that the two-year voter registration restriction ensures that Missouri's "State Representative candidates are serious, committed to the electoral process, and exhibit a meaningful interest in public affairs. Encouraging would-be candidates to participate in elections furthers this compelling state interest." The State similarly argues in its brief that "disqualifying candidates failing to meet the two-year voter registration requirement is to ensure that office holders have an established stake in the administration of government in the community they seek to represent."

While having candidates who are serious and committed to the electoral process and have an established stake in the administration of local government may be desirable, surely the State is not suggesting that it could constitutionally limit the ability to run for office to only those persons who display those characteristics, which are located nowhere in Missouri statutes, nor set out in the Missouri Constitution. Indeed, while all citizens may wish their fellow voters and elected officials to display these characteristics, if proof that elected officials actually display such characteristics were required, then there would be an abundance of cases brought throughout the courts of this and every state as candidates contested whether their opponents adequately displayed these civic virtues.

Even if it were a legitimate state goal to limit candidates to those who show serious commitment to public affairs, however, the State has failed to show that to meet that goal it is necessary to burden a potential candidate's rights, and potential voters'

10

rights, by prohibiting people from running for state representative unless they have been registered to vote for two years.

Why is registration any more relevant to guaranteeing a committed and civic-minded representative than would be other far stronger indicators of public mindedness, such as testifying about public issues, demonstrating for or against public issues of the day, being active in the League of Women Voters, working for a candidate for election, or any of a dozen other indicators of civic pride and interest? A person can register to vote without engaging in any of these or any other type of civic involvement, participation in community activities, or even interaction with any members of the community. Certainly the State did not present any evidence that the mere act of voter registration leads to further civic involvement.

Indeed, as the State notes, *only a third of registered voters even vote at all.* Yet, the State did not condition running for office on actually voting, but only on having circumnavigated the bureaucratic process sufficiently to register, a task that the State suggests is very simple to accomplish. How, then, does completing the registration forms provide necessary proof that one is qualified to be a state representative?

The Fifth Circuit rejected just such irrelevancies in striking down the three-year durational voter requirement in *Henderson,* stating that the "three year 'qualified voter' requirement … goes beyond the *necessary power* of the state to prescribe minimal candidate qualifications and denies appellant … rights secured by the Equal Protection Clause of the Fourteenth Amendment." *526 F.2d. at 293* (emphasis added). Indeed, *Henderson* noted the irony of such a durational *registration* requirement as it pertained to

11

the plaintiff, who had lived in the community he sought to represent for 13 years: "The importance of this distinction—between residency and registration—is no more amply demonstrated than by the fact that appellant Henderson has been a resident of the Fort Worth School District for thirteen years, but will still be ineligible as a candidate in the 1976 election." *Id. at 290*.

*Board of Sup'rs of Prince George's Cnty v. Goodsell, 396 A.2d 1033, 1039 (Md. App. 1979)*, rejected a similar argument, holding that "[t]he Board has suggested no relationship between mere registration and 'awareness of the County.' And we can perceive little additional familiarity a long-time resident of the County would have with local issues *simply by being registered to vote*." (Emphasis added).

For these same reasons, Missouri's requirement that potential candidates be registered to vote for two years is not necessary to achieve its interest in having serious, committed candidates. Indeed, the State itself recognizes that a durational voter registration requirement is not necessary to identify those who are qualified for public office, for *no State level public office other than the office of State Representative has a two-year registration requirement.* While the office of State Senator requires a three-year registration, and some state judicial seats require *nine-year* registration, the candidate could run for Governor, Lieutenant Governor, Attorney General, Secretary of State, and State Auditor without *ever* having been registered to vote; and run for a host of other state and local offices by simply registering to vote at the time of the election.

Similar inconsistency in imposing a supposedly "necessary" registration requirement has led other courts to conclude that a registration restriction imposes an

12

unnecessary burden on voting rights and so to invalidate their respective durational voter registration requirements. The New Jersey Supreme Court, in *Gangemi v. Rosengard, 207 A.2d 665, 669 (N.J. 1965),* for instance, said that if registering to vote for a certain period ensures qualified candidates, why did the requirement not apply to candidates for Governor, Senator, or Assemblyman? Similarly, in *Treiman v. Malmquist, 342 So.2d 972, 976 (Fla. 1977),* the Florida Supreme Court found noteworthy "the fact that this restriction applies solely to candidates for judicial office. No such similar restraint is placed on candidates for any other political office." *Id.*

The State makes the similar argument that it "can rationally conclude that the legislature is better served by someone who took the time necessary to at least become eligible to vote for who should serve the current term." But, the discussion is about being qualified to run not for the current term but for the next term after registration. Why is such a long registration requirement a *necessary burden* on Ms. Johns' and voters' rights? Why is it not up to the voters to determine by their votes whether they value whatever character trait may be shown by registering earlier than one's opponent? While registration to vote may say something about knowledge of the voting process, it is far less relevant than many other actions or characteristics, and could not be considered to impose a necessary burden to elect a responsible legislator.

It was for these reasons that in *Celebrezze* itself the Supreme Court rejected a very similar argument. In that case, an Ohio statute required all independent candidates to register by March to be placed on the November ballot. *460 U.S. at 794*. Ohio argued that this requirement promoted informed voters by giving voters time to educate

13

themselves about otherwise unknown independent candidates. *Id. at 796*. But the Supreme Court held that, far from educating voters, "A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." *Id. at 798*. It further noted that "the best means [to educate voters] is to open the channels of communication rather than to close them[]" through arbitrary restraints. *Id.*

Similarly, in *Goodsell* the Maryland Court of Appeals rejected an argument that a durational voter registration requirement ensured candidates had an awareness of the county they wished to serve and prevented "frivolous candidates" from running for office. *396 A.2d at 1039*. *Goodsell* held that "in a democracy, the appropriate judges of which candidates are frivolous, and which candidates have the greater commitment to the County, are the *voters on election day*." *Id*. (Emphasis added)

Finally in *Gangemi,* the New Jersey Supreme Court refused to uphold a durational voter registration requirement because "individual fitness is something the *voters* decide and *the intensity of a candidate's interest is part and parcel of that subject*. The Legislature *cannot take that issue from them*. [The two-year voter registration requirement] would do so; it is therefore invalid." *207 A.2d at 669* (emphasis added).

So too here, the State would argue that this restriction on would-be candidates promotes qualified, involved, and committed candidates. But, just like in *Celebrezze*, *Goodsell*, and *Gangemi*, restricting the rights of candidates and voters simply because the candidate did not register to vote more than two years prior to an election is not necessary to produce high-quality candidates for state representative. Neither is there any

14

constitutional basis for making a candidate's level of civic engagement and commitment a requirement to run for office as opposed to a personal characteristic that can be brought up as a natural part of a competitive race, challenged by the opponent and debated vigorously.

Weighing the burden placed on Ms. Johns and voters against the strength and legitimacy of Missouri's interests, the two-year voter registration requirement is not necessary to achieve these interests and, therefore, places a substantial burden on the First and Fourteenth amendment rights of Ms. Johns and voters. Finding that this restriction imposes a substantial burden, strict scrutiny must be applied, and this burden does not pass strict scrutiny. *See Norman, 502 U.S. at 289.*

## II. The Durational Voter Registration Restriction Is Invalid Whether Subject to Strict or Rational Basis Scrutiny

The State itself conceded at oral argument that the two-year registration requirement *cannot stand if it is subjected to strict scrutiny.* This is because the State has no compelling interest in precluding voters from considering otherwise qualified candidates simply because they have been registered to vote for only one year, or in the case of Ms. Johns, until she has been registered for 45 months, rather than for two years. Moreover, even if ensuring serious and committed candidates with a stake in the community they wish to serve was a compelling interest, a two-year voter registration is not a narrowly-tailored way to accomplish this goal. This law simply does not pass strict scrutiny. For these reasons, I would hold the two-year registration requirement invalid.

Even applying rational basis review, however, this arbitrary two-year durational voter registration requirement should be held unconstitutional. The very issues discussed

15

above in analyzing why the registration requirement imposes a substantial burden demonstrate why that burden also is arbitrary and irrational. In fact, although Missouri has not had occasion to consider whether there is a rational basis for such a durational voter registration requirement, similar restrictions have been challenged around the country and have not withstood constitutional review. *See, e.g., Gangemi, 207 A.2d 665 (N.J. 1965); Treiman, 342 So.2d 972 (Fla. 1977); Goodsell, 396 A.2d 1033 (Md. App. 1979).*[1]

The high courts in at least two states have held that, even under a rational basis standard, these types of durational voter registration requirements are invalid. In *Gangemi*, the New Jersey Supreme Court could not even "conceive a *rational* connection between the supposed aim of the [registration requirement] and class of municipalities to which its operation is limited." *207 A.2d at 670.* Similarly, in *Treiman*, the Florida Supreme Court held that even a *one-year* voter registration requirement "does not serve any *reasonable or legitimate* state interest. It does not in any way protect the integrity of the election process or purity of the ballot; it does not serve to keep the ballot within manageable limits ….. The barrier it erects is an unnecessary restraint on one's right to

---

[1] While some of these cases have been decided on equal protection grounds, the courts' analysis of the validity of durational voter registration requirements are still relevant here for this same reasoning applies to Ms. Johns' arguments concerning restriction of her rights and those of the voters. In her cross-motion for judgment on the pleadings Ms. Johns did raise the effect of these restrictions on her Fourteenth Amendment equal protection rights, but the majority holds she did not do so sufficiently to preserve the separate equal protection argument because she did not specifically state this was an alternative ground for relief. There is no point in undertaking a separate equal protection analysis here, other than to state that Ms. Johns raises very serious equal protection arguments.

16

seek elective office." *342 So.2d at 976* (emphasis added).

In *Goodsell*, although the court struck down a five-year voter registration requirement using strict scrutiny analysis, it implied that even under a rational basis test, it could not perceive a relationship between the restriction and the state's interest, stating: "The Board has suggested no relationship between mere registration and 'awareness of the County.' And we can perceive little additional familiarity a long-time resident of the County would have with local issues *simply by being registered to vote*." *396 A.2d at 1039* (emphasis added). Registering to vote two years prior to the election simply does not further the interest of assuring that individual candidates will be any more qualified, serious, or committed than those who have not.

Rather than promoting qualified candidates, the two-year voter registration requirement punishes those individuals who had not previously been involved in public service but who may have been inspired to run for political office and register to vote within two years of an election, by eliminating them from contention in the upcoming election. Far from "encouraging would-be candidates to participate in elections," the durational voter registration requirement may dissuade would-be candidates from running in the next election because the candidate did not sign a voter registration application within the two-year requirement. Indeed, if citizens in a particular district are roused by the words of a would-be candidate during the years preceding an election but are prohibited from voting for that candidate, it may deter them from voting or participating in future elections, thwarting the State's interest in encouraging civic involvement.

Further, to the extent that the two-year voter registration provision requires

17

registration *in Missouri*, it is a restriction on the right to travel and so would be subject to strict scrutiny and should be invalidated on that basis. It certainly is not narrowly tailored to the asserted state interest in having candidates show an interest in the electoral process. *See, e.g., Saenz v. Roe, 526 U.S. 489 (1999).*

In fact, though, there may be no travel restriction imposed by the registration requirement, for neither article III, section 4 nor section 21.080 require that the candidate seeking office have been registered *in Missouri* for the two-year period prior to the election at which they wish to run for office. These laws require only that the would-be candidate be a "qualified voter," which has been interpreted to mean "registered voter." *See State ex rel. Burke v. Campbell, 542 S.W.2d 355, 358 (Mo. App. 1976).* They do not require the candidate to be a "qualified voter of this state." Of course, to actually take office the candidate would have to actually reside in the district the candidate seeks to represent and would have had to change registration at some point, but that does not apply to the entire two-year period in question.

If the statute and constitution simply were silent as to where one must be registered, it might be logical to infer that the registration must have to be in Missouri for the full period of time nonetheless. But, the legislative history in this area does not permit such an inference. As the majority notes the Missouri constitution originally required a state representative to be a "qualified voter *of this state* two years." *MO. CONST. art. IV, sec. III (1865)* (emphasis added). But, the words "of this state," were removed from the 1945 constitution. *MO. CONST. art. III, sec. 4 (1945).* A purpose must be inferred from such a language change, and the only one that seems to exist is that the

18

people wanted a potential candidate to qualify under Missouri law to run for state representative even if registered in an entirely different state for most of the prior two-year period.

The majority claims the lack of requirement that the registration be in Missouri shows that the voter registration requirement had little to do with residency, and simply is concerned with social and civic engagement. But, why would a candidate's civil and social engagement *in another state* bear any rational relationship to whether the candidate is qualified to run for state representative *in Missouri*?

Perhaps for this reason, the State's and Respondent's briefs make clear that they believe that it is engagement in *Missouri's* political system that is relevant. Respondent noted in his brief: "Because *Missouri's* general elections occur once every two years, Art. III, Sec. 4 encourages would-be State Representatives to register to vote and participate in the electoral process before running *for that office*." And the State noted: "the rational purpose for temporarily disqualifying candidates failing to meet the two-year voter registration requirement is to ensure that office holders have *an established stake in the administration and in the community they seek to represent*." Yet, allowing registration in another state would not serve either of these goals.

Far more relevant to showing commitment to the community the candidate seeks to represent is the requirement of a one-year residency in the district to run for office. *See MO. CONST., art. III, sec. 4* and *§ 21.080*. That requirement does at least ensure that the person have experience in the community the person seeks to represent. Indeed, even if a limitation to registration *in Missouri* were read into the registration requirement, it is

19

uncontested that neither the constitution nor any statute requires that the registration be in the *community* in which the person is running for office. The candidate could register in Kansas City and then run for office in and vote in Ferguson if the one-year residency requirement were met so long as the candidate's registration was transferred to the local district. The State's argument then, that it has an interest in having candidates who at least have some "established stake" in their community, evaporates if the two-year voter register requirement is satisfied by a candidate *who has not been registered for two years in the community the candidate seeks to serve*.

For these reasons, as well as the reasons considered earlier in addressing whether the burden is a substantial one, I would hold that the two-year durational voter registration requirement is unconstitutional. I believe that it places a substantial burden on the First and Fourteenth amendment rights of Ms. Johns and voters and is not narrowly-tailored to achieve the State's purported interest in promoting civic education and ensuring candidates who have an "established stake" in their community. But, even if this Court were correct in applying rational basis review, Missouri's two-year voter registration requirement is not rationally related to a legitimate state interest. I therefore dissent.

_____
**LAURA DENVIR STITH, JUDGE**